# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 25-2173

———————————————

Ross Christensen

*Plaintiff - Appellant*

v.

Union Pacific Railroad Co.

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Nebraska - Omaha

——————————

Submitted: May 12, 2026
Filed: August 11, 2026

——————————

Before COLLOTON, Chief Judge, SHEPHERD and KOBES, Circuit Judges.

——————————

SHEPHERD, Circuit Judge.

Ross Christensen worked for Union Pacific Railroad Co. (Union Pacific) as a conductor for over ten years. His job entailed, among other things, operating and moving trains and performing switching operations. After Christensen suffered an ischemic stroke in 2015, Union Pacific did not permit him to return to work as a conductor. So Christensen sued Union Pacific, asserting a disparate treatment claim

under the Americans with Disabilities Act (ADA). The district court[1] granted summary judgment in Union Pacific's favor. Christensen appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On January 9, 2015, while at home and off duty, Christensen suffered a stroke and lost consciousness. He went to the hospital, where he was diagnosed with aphasia and right hemiparesis. Later, Christensen was transferred to a second hospital, where he was diagnosed with atrial fibrillation, among other conditions. Christensen received medications to address the blood clots that caused the stroke; those medications apparently caused minor bleeding in his brain.

By all accounts, Christensen recovered well. Within four days, most of his neurological symptoms had disappeared. And Dr. Kevin Call, Christensen's treating neurologist, cleared Christensen to return to his work as a conductor by the end of February 2015.

Christensen underwent three electrical cardioversion procedures on February 24, 2015, to resolve his atrial fibrillation, the condition that predisposed him to strokes. These procedures did not succeed, so Christensen's cardiologist, Dr. David Cragun, referred Christensen to an electrophysiologist, Dr. David Wang. On March 3, 2015, Dr. Cragun cleared Christensen to return to work. Roughly two months later, on April 30, 2015, Dr. Wang performed a successful ablation procedure, restoring Christensen's heartbeat to a normal rhythm.

Because Christensen suffered a stroke, Union Pacific's Health and Medical Services (HMS) department required him to submit to a medical fitness-for-duty evaluation and requested his medical records. Christensen promptly provided them.

---

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska.

Two physicians—Dr. John Holland and Dr. John Charbonneau, Union Pacific's Chief Medical Officer—reviewed Christensen's records. After that review, Dr. Charbonneau decided to impose one-year sudden-incapacitation restrictions on Christensen's work. Those restrictions prevented Christensen from, among other things, operating company vehicles and machinery and working on or near moving trains. In view of these restrictions, Christensen could not work as a conductor. Union Pacific told Christensen that it could revisit these restrictions one year after the date of Christensen's stroke—i.e., January 9, 2016. Dr. Charbonneau noted that before Union Pacific would let Christensen return to work, it would require that Christensen submit updated medical records, undergo a further fitness-for-duty evaluation, and remain neurologic-event free.

In December 2015, Christensen began the return-to-work process. He provided Union Pacific with updated medical records, which included exam notes from an additional physician, Dr. Mohammad Entezari-Taher. Those notes described Christensen's recovery as "excellent" and acknowledged that while Christensen was experiencing "[m]ild clumsiness in [his] right hand," his balance and walking were normal. Dr. Entezari-Taher concluded that Christensen was generally strong and neurologically capable of driving commercially. Christensen's records further indicated that he had not suffered a further neurologic event following his January 2015 stroke.

Dr. Holland performed a further fitness-for-duty evaluation. As a result of that evaluation, he concluded that Christensen "ha[d] an unacceptable risk for future seizure relating to his history of stroke and intracerebral hemorrhage." Dr. Holland explained:

> The scientific literature documents that persons such as Mr. Christensen, who has had a stroke and/or intracerebral hemorrhage in the cortical or sub-cortical areas of the brain, have substantially increased risk for future seizures, due to damage to the brain tissue caused by the stroke hemorrhage. Mr. Christensen's stroke and intracerebral hemorrhages were in the parietal and temporal lobes,

-3-

which are parts of the brain cortex. With these types of brain injury, the risk for future seizures exists even if the person has not already had a seizure. However, if the person remains seizure free and off of all anti-seizure drugs for 5 years after the stroke, then the statistical risk for a future seizure declines to an acceptable risk level for safety critical positions (i.e., less than 1% per year occurrence rate).

Based on this scientific evidence about the risk of seizures after a cortical stroke and/or intracerebral hemorrhages, the evidence based risk assessments and guidance documents from the Federal Motor Carrier Safety Administration (FMCSA) state a commercial driver that has had either of these conditions should be prohibited from driving commercial vehicles for at least 5 years. FMCSA guidance documents also state the person may return to commercial driving if the individual has no history of interval strokes, TIAs[,] or seizures, and a current thorough medical evaluation shows no risk factors for these neurological events, and no ongoing functional impairment. HMS considers these recommendations of FMCSA to be evidence-based, and to well characterize risks for sudden incapacitation for work[] in other safety critical positions . . . where the . . . job requirements and safety risks are substantially similar to those of a commercial driver.

Therefore, Mr. Christensen has been given . . . work restrictions for Sudden Incapacitation risks . . . to remain in place for a minimum of five years after his . . . stroke . . . due to his significant and imminent risks for a future stroke, TIA[,] or seizure due to his cortical stroke and intracerebral hemorrhages. In January 2020 these work restrictions may be reviewed and removed . . . .

Dr. Holland called Christensen on March 18, 2016, to discuss Union Pacific's decision to continue his work restrictions for five years post-stroke. Dr. Holland told Christensen that, while he had originally been placed on restrictions for one year, as was then Union Pacific's common practice, Union Pacific "ha[d] changed its practice due to updated scientific information about the frequency of seizures after strokes and intracerebral hemorrhage if in the cortical or subcortical regions of the brain."

-4-

Roughly two years later, in February 2018, Christensen asked that Union Pacific reevaluate his work restrictions. Dr. Charbonneau reviewed Christensen's 2016 fitness-for-duty evaluation and updated medical records and concluded "no basis" existed for removing Christensen's restrictions. Christensen contends he tried again in 2020 to change Union Pacific's mind about his work restrictions. Union Pacific states that its practice is not to affirmatively reach out to employees about returning to work as their return-to-work dates approach; instead, Union Pacific waits for employees to reach out. Union Pacific contends that it has no record of Christensen's 2020 return-to-work request.

Christensen never returned to work as a conductor. While the parties made some efforts at reconciliation after Christensen's 2020 return-to-work date came and went, Christensen did not trust Union Pacific by that point and was approaching retirement age.

Christensen sued Union Pacific for damages in 2023. His complaint asserted ADA disparate treatment claims under 42 U.S.C. § 12112(a) and (b)(6). Christensen ultimately conceded that the claim brought under the latter subsection could be dismissed, and the district court did so, leaving only his claim under § 12112(a).

Union Pacific moved for summary judgment. It argued that Christensen lacked direct evidence of disability discrimination and so had to establish discrimination under the burden shifting framework specified in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). And it argued that Christensen could not do that because he lacked sufficient evidence to make out a prima facie case of discrimination. Finally, Union Pacific argued that it was entitled to summary judgment on a direct threat affirmative defense.

Recognizing that "[t]his is not an easy case" because the "nature of Christensen's disability claim and the circumstances of this case present some tricky questions with respect to" the application of the McDonnell Douglas framework, the district court focused exclusively on Union Pacific's direct threat defense. It

-5-

reasoned that Union Pacific had conclusively established this defense because it was undisputed that Christensen worked in a safety-sensitive position and because "[t]here is also no question that Christensen's stroke resulted in a heightened risk of seizures." The district court further noted that Union Pacific had completed an individualized fitness-for-duty evaluation for Christensen, assessing the nature and duration of the risks he faced and his ability to safely perform his job, and that while Christensen's increased risk for seizure might have been relatively low, the nature and severity of the potential harm if a seizure occurred on the job "was extreme" and the threat of a seizure is "imminent" by nature.

Christensen appeals the grant of summary judgment in Union Pacific's favor.

II.

We review a district court's grant of summary judgment de novo. Metro. Prop. & Cas. Ins. Co. v. Calvin, 802 F.3d 933, 937 (8th Cir. 2015). "Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Id. (citation omitted). Christensen contends that the district court erred in granting summary judgment in Union Pacific's favor, because genuine disputes of material fact exist as to its direct threat defense.

To establish an employer's liability on a § 12112(a) disparate treatment claim, an ADA plaintiff must prove that "(1) he was 'disabled,' (2) he was 'qualified,' and (3) the employer imposed work limitations because of his disability." Sanders v. Union Pac. R.R. Co., 108 F.4th 1055, 1060 (8th Cir. 2024) (citation omitted). But the ADA recognizes a "direct threat" defense to disparate treatment claims, allowing an employer to avoid liability even if the plaintiff proves these elements. See id. at 1062; 42 U.S.C. §§ 12111(3), 12113(b). An employee constitutes a direct threat if, because of his disability, he poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Direct threat is an affirmative defense for which the employer bears the burden of

-6-

proof.  See EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 571 (8th Cir. 2007).  To establish this defense, the employer must prove that its determination that its employee posed a direct threat was "(1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the 'most current medical knowledge and/or on the best available objective evidence.'"  Sanders, 108 F.4th at 1062 (citations omitted).  Moreover, "[s]pecific factors to be considered [in an employer's direct threat analysis] include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm."  Wal-Mart Stores, 477 F.3d at 571 (citation omitted).

Here, the summary judgment record establishes each element of Union Pacific's direct threat defense.  First, it shows that Union Pacific conducted an individualized assessment.  That assessment included multiple rounds of fitness-for-duty evaluations that involved comprehensive review of Christensen's medical records, his condition, and his job duties.  Second, it shows that Union Pacific's decision to restrict Christensen from returning to work as a conductor was objectively reasonable.  Union Pacific relied on the opinions of multiple physicians and on an extensive medical record in reaching its decision.  And third, the record shows that Union Pacific acted on the most current medical knowledge and on the best available objective evidence.  Again, it is undisputed that Christensen provided—and Union Pacific reviewed—the appropriate medical records.  And Union Pacific set forth evidence that it appropriately consulted the FMCSA guidelines: per Dr. Holland, the FMCSA's recommendations are "evidence-based" and "well characterize risks for sudden incapacitation for work[] in . . . safety critical positions . . . where the . . . job requirements and safety risks are substantially similar to those of a commercial driver."

Christensen failed to raise a fact dispute on any element.  Christensen first contends that a jury could find that Union Pacific did not conduct an individualized assessment because it relied on the FMCSA guidelines.  But it does not follow from the fact that Union Pacific relied on the guidelines that Union Pacific failed to

-7-

conduct an individualized assessment. Indeed, Union Pacific had to conduct an individualized review to determine that the FMCSA's five-year guideline even applied. That guideline's application is triggered by the existence of an elevated seizure risk, which Union Pacific determined existed for Christensen based on a review of his condition and circumstances—including the brain bleed Christensen suffered during treatment for his stroke.

Christensen does not persuasively argue that Union Pacific was required to do anything more. He relies principally on our decision in EEOC v. Drivers Management, LLC, 142 F.4th 1122 (8th Cir. 2025), in support of his argument that he raised a fact issue on the individualized-assessment element of Union Pacific's direct threat defense. But the facts of that case stand in stark contrast to the facts of this one. In Drivers Management, the employer "just made a few general calls to back up [its] 'prejudice, stereotypes, [and] unfounded fear' of allowing a deaf individual to drive [the employer's] truck." 142 F.4th at 1133 (second alteration in original) (citation omitted). On the undisputed facts, Union Pacific's review—involving multiple fitness-for-duty examinations based on reviews of the medical records that Christensen supplied—was more robust by orders of magnitude. Drivers Management does not compel the conclusion that Christensen raised a fact issue here.

Next, Christensen argues that he raised a fact issue on the objective reasonableness of Union Pacific's direct threat determination because his personal physicians cleared him to return to work. But the fact that Christensen's physicians on the one hand, and Union Pacific's on the other, disagreed as to whether he could safely return to work is not material. True, Christensen's evidence might allow a jury to conclude that Union Pacific was overcautious or wrong in evaluating the safety risk that Christensen posed. That is not the question, however. The question is objective reasonableness, and mere disagreement among experts does not show

Union Pacific's decision was objectively unreasonable.[2] See, e.g., Michael v. City of Troy Police Dep't, 808 F.3d 304, 309 (6th Cir. 2015) ("Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct." (citation omitted)); Carrillo v. Union Pac. R.R. Co., No. 22-50782, 2024 WL 3861374, at *5 (5th Cir. Aug. 19, 2024) (per curiam) ("[E]ven if Dr. Charbonneau had disagreed with one of the other medical professionals, the direct threat analysis asks whether the employer made a 'reasonable medical judgment[]'—not whether every examining doctor came to the same exact conclusion." (citation omitted)); Jackson v. Union Pac. R.R. Co., No. 4:19-CV-00069-RGE-RAW, 2021 WL 1726895, at *20 (S.D. Iowa Mar. 29, 2021) ("A plaintiff does not generate a factual issue as to the objective reasonableness of the employer's direct threat determination merely by supplying its doctor's contrary opinions."). While a reasonable jury could perhaps conclude from Christensen's evidence that Union Pacific misjudged the safety risk he posed, there is nothing in the record that would allow a jury to conclude that Union Pacific's judgment was so off-base as to be objectively unreasonable. Christensen's physicians did not opine, for instance, that *no* physician could have reasonably reached a conclusion differing from theirs. To the contrary, Dr. Call conceded that risk prediction in this context is an imprecise science and no tool exists that is "perfectly predictive" of risk.

Christensen tries to avoid this conclusion by citing our prior decision in Sanders. But Sanders underscores that Christensen lacks the kind of evidence he would need to raise a fact issue here. In that case, we held that a reasonable jury could have found that Union Pacific failed to act objectively reasonably when it restricted the plaintiff from performing his job duties after he suffered a cardiac

---

[2]Christensen also notes that he received a commercial driver's license during the relevant period after a medical examination. The examiner who passed Christensen reached a different decision than Union Pacific's physicians, but again, that does not permit a finding that Union Pacific's physicians reached an objectively unreasonable conclusion.

arrest. Sanders, 108 F.4th at 1059, 1062. But in reaching that conclusion, we emphasized the testimony of the plaintiff's expert, who opined that "Union Pacific's decision to limit [the plaintiff] was 'completely uncalled for, completely wrong, and not based on any medical principles at all.'" Id. at 1062. Christensen points to no evidence in the summary judgment record bearing on the unreasonableness of Union Pacific's decision here. Moreover, Sanders does not make for an apples-to-apples comparison to our case. The Sanders plaintiff, unlike Christensen, did not serve in such a safety-critical role. See id. at 1059. That fundamentally changes the direct threat analysis Union Pacific had to perform here. See Wal-Mart Stores, 477 F.3d at 571 (recognizing the "nature and severity of the potential harm" as one of the factors an employer must weigh in evaluating whether an employee's health condition poses a direct threat).

Finally, Christensen asserts that he raised a fact issue on the question of whether Union Pacific relied on the "best current medical or other objective evidence" when it imposed its restrictions. As he points out, the FMCSA withdrew its guidelines "because some of the information [they contain] was obsolete or . . . prescriptive in nature." The Fifth Circuit has rejected arguments virtually identical to Christensen's about the import of the guidelines' withdrawal. In Carrillo, that court held that evidence that "Union Pacific looked partly to guidance documents from the [FMCSA] that were not peer-reviewed and were removed from the FMCSA website" was not sufficient to raise a fact issue as to whether Union Pacific relied on adequate evidence in reaching its decision. 2024 WL 3861374, at *5. The court acknowledged that it was "undisputed on th[e] record that the guidance documents were evidence-based and developed through a consensus of medical experts," and observed that the plaintiff failed to "identify medical literature missing from Union Pacific's consideration" or "claim that Union Pacific 'intentional[ly] disregard[ed]' the best objective evidence." Id. (second and third alterations in original) (citation omitted).

Christensen criticizes Carrillo's analysis as burden shifting. But that is the nature of summary judgment. Once the movant has discharged its initial burden of

apprising the court of the basis for its summary judgment motion and identifying the parts of the record it believes demonstrate the absence of genuine disputes of material fact, it falls on the non-movant to show genuine disputes of material fact exist. See Mensie v. City of Little Rock, 917 F.3d 685, 688 (8th Cir. 2019) (articulating summary judgment standards). Here, as in Carillo, that did not happen. We find Carillo persuasive and reach the same conclusion as the Carillo court. Christensen did not raise a fact issue as to the adequacy of the materials on which Union Pacific relied.

Because no genuine dispute of material fact exists as to any component of Union Pacific's direct threat defense, the district court properly granted summary judgment in Union Pacific's favor.

III.

For the foregoing reasons, we affirm the judgment of the district court.

_____